**STRATOFLEX, INC., Plaintiff,**

v.

**AEROQUIP CORPORATION, Defendant.**

Civ. A. No. 79–70017.

United States District Court,
E.D. Michigan, S.D.

Aug. 16, 1982.

Neal Waldrop, Troy, Mich., for plaintiff.

Don Harness, Birmingham, Mich., for defendant.

## OPINION AND ORDER GRANTING JUDGMENT IN FAVOR OF PLAINTIFF

PATRICIA J. BOYLE, District Judge.

Plaintiff, Stratoflex, Inc., a Texas corporation, seeks a declaratory judgment declaring invalid and non-infringed United States Patent No. 3,473,087 ('087) issued October 14, 1969, and owned by Defendant, Aeroquip Corporation, a Michigan corporation, which has counterclaimed against Stratoflex for infringement.

In essence, Defendant alleges that the claims of the '087 Patent in suit are product claims, not limited to the mixing method referred to in the patent. In their broadest

form, the claims at issue cover a composite extrudate or tubing having an inner tubular extrusion comprising electrically conductive particles and Teflon™ and an outer extrusion of Teflon.™ Plaintiff's composite electrically conductive tubing is alleged to contain all elements of Defendant's product claims and, hence, to infringe the '087 Patent.

Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the following findings of fact and conclusions of law.

The technology in question is polytetrafluoroethylene (PTFE) Teflon™ hose used in the aircraft and missile industry to convey fuel, lubricants and other fluids. Both Stratoflex and Aeroquip are manufacturers and suppliers of PTFE hose, fittings, couplings, and related equipment for industrial and military use. In general the hose is a tube reinforced with one or more braids of fiber or metal wire. Fittings are connected to the hose ends and sold as hose assemblies. Aeroquip owns the patent in suit which was acquired in the purchase of a portion of the business of Raybestos-Manhattan, Inc. Stratoflex is the only manufacturer of electrically conductive aircraft hose which is not licensed in the United States under the '087 Patent. The electrically conductive PTFE hose sold by Defendant Aeroquip is a composite hose having an inner layer containing carbon black and an outer layer of white or unfilled PTFE containing no carbon black. The hose sold by Plaintiff Stratoflex also has an inner portion containing carbon black and an outer portion containing about 0.1 percent by weight of carbon black. Plaintiff's hose thus appears black throughout.

The parties agree that in 1959, roughly contemporaneous with the development of hydrocarbon fuel for use in jet engine assemblies, leakage problems were discovered in Teflon™ hose tubing in military jet aircraft fuel systems. At this time, military specifications did not set forth minimum electrical conductivity requirements for aircraft hose. The leakage occurred because of failures consisting of pinholes in the walls of the hose, allowing leakage of fuel through the hose.

Three types of Teflon™ tubing were being sold as aircraft hose, white or unfilled PTFE, sold by Titeflex, pink PTFE sold by Aeroquip, and black PTFE manufactured by Resistoflex and B.F. Goodrich, Plaintiff's supplier at the time. The black tubing took its color from a small amount of carbon black (0.01 percent to 5 percent), dispersed uniformly through the tube and used as an extrusion aid according to the teaching of the Walker patent, No. 2,752,637, issued in 1956. The pinhole leaking problem was initially observed in products supplied by Titeflex and Aeroquip. No field complaints were received as to the black B.F. Goodrich hose sold by Stratoflex.

Pure Teflon™ tubing is highly suitable for aircraft fuel systems because it is chemically inert, does not degrade with time, and is stable at high temperatures. While carbon black had been used as an extrusion aid by some manufacturers and was a known electrical conductor, a large amount of carbon in the tube wall would create more discontinuity and potential for fuel seepage through the wall.

Beginning in 1959, Aeroquip engineers conducted an investigation of the pinhole leak problem. In April, 1961, J.C. Abbey, Aeroquip's Chief Engineer, and T.E. Upham, a Staff Engineer, presented a report to the Society of Automotive Engineers attributing the problem to the buildup of static electricity caused by the flow of hydrocarbon fuels through the PTFE hose and the subsequent discharge or arcing of electrical charges through the wall of the tubing. The Abbey-Upham Report found failures of all three types of tubing (red or pink, white, and black) due to electrostatic discharge, although the carbon black filled tubes demonstrated markedly greater resistance to breakdown, and it was postulated that "the greater resistance to breakdown exhibited by the carbon black filled tubes was due to the ability of the carbon to increase the conductivity of Teflon." Abbey-Upham Report, Exhibit 10 at 14. In testing, the red tubes failed at two hours; the white tubes, at three hours; and the

black tubes, respectively, at fourteen and one-half hours and fifteen hours. Based on these results the report concluded that "[t]he susceptibility of Teflon lined hose to pinhole failure, under the reported conditions, is proportional to its electrical conductivity. The higher the level of conductivity the greater the protection afforded." *Id.* 23.

The Abbey-Upham Report considered the "possibility of establishing continuous longitudinal strings of carbon particles during extrusion" to provide continuous conductivity, but deemed this possibility "remote." *Id.* 17.

The Aeroquip investigation by Abbey-Upham sparked a joint investigation with Raybestos-Manhattan, Inc., a Teflon™-tube supplier, to seek a solution to the electrostatic fuel failure problem. The goal was to develop an electrically conductive PTFE tubing, which would also have superior resistance to fuel effusion or leaking. This work culminated on May 22, 1962, in the filing of the '087 Patent whose claims are in issue. W.L. Slade, an employee of Raybestos, is the inventor of the patent.

Almost simultaneously Titeflex initiated its own development program. This program resulted in the development of the tubing which is the subject of the Rowand and Larose patent, United States Patent No. 3,166,688, filed November 14, 1962. This patent was the subject of the interference proceedings initiated by Slade's attorneys. Specifics of the claims and the result of the interference are discussed *infra.*

*Plaintiff's Activities in PTFE Hose*

Prior to 1962 Plaintiff purchased "standard" black hose from B.F. Goodrich, manufactured under a license from Resistoflex under the Walker patent, United States Patent No. 2,732,637, which relates to improving the extrusion of PTFE by employing 0.01 percent to about 5 percent by weight of carbon. As noted earlier, neither B.F. Goodrich nor its customer, Stratoflex, received complaints that there were field pinhole failures of this hose. Moreover, tests conducted at Titeflex in December, 1962, demonstrated that Stratoflex all black tubing was conductive.

As a result of a desire by Curtis Wright to use a more highly conductive hose for fuel transfer in its jet engines, Mr. Horace Cooke of Stratoflex asked B.F. Goodrich in December to provide him with a sample hose which was more electrically conductive than the standard black. Within three days B.F. Goodrich provided samples of a black, highly conductive tubing having an inner liner enriched with carbon black and an outer layer also containing a small amount of carbon black. Before the samples were made, B.F. Goodrich consulted its licensor, Resistoflex, which provided a back-up composite preform for B.F. Goodrich to use. There is no evidence that Resistoflex was aware of the composite tubing which Aeroquip and Titeflex also demonstrated in the Curtis Wright tests. B.F. Goodrich, moreover, did not use the Resistoflex preform but rather made its own.

The test results were inconclusive "and no one type showed superiority over any other." Thereafter, the Bureau of Standards established electrical conductivity standards for aircraft hose, as did the military.

From 1963 forward, Stratoflex continued to purchase hose from B.F. Goodrich until 1970 when B.F. Goodrich terminated the production of composite conductive tubing. Stratoflex then purchased its electrically conductive tubing from Titeflex.

In 1975 Stratoflex established a relationship with Mr. John Millard, an employee of Uniroyal, with the intention of beginning manufacture of its own hose for commercial and military sale. Beginning in 1977, Stratoflex manufactured commercial or transparent Teflon™ hose and black electrical conductive aircraft hose designated as 124 and 127.

As manufactured presently, Stratoflex hose 124 has an inner layer containing 2.0 percent by weight of carbon black uniformly dispersed. The outer layer contains .01 percent of 1 percent, *see* p. 106 Vol. I. This amount of carbon black is used as a processing aid, and there is no difference in the

performance or functioning of the electro-conductive tubing or in its ability to meet military specifications by virtue of the inclusion of this amount of carbon in the Stratoflex product. The "salt and pepper" technique is not employed by Plaintiff to incorporate the carbon black into the PTFE solution.

The Stratoflex electrically conductive tubing is formed by extruding an extrudate having an inner layer or extrusion portion comprised of particles of unsintered [1] tetrafluoroethylene polymer and pulverulent, inert electrically conductive carbon black particles, and having an outer layer of unsintered tetrafluoroethylene polymer containing the previously described amount of carbon black.

After extrusion, the tube is sintered, producing an electrically conductive tubing formed of attached concentric layers, the inner annular portion consisting of a uniform dispersion of electrically conductive particles and the outer layer being relatively non-conductive. As noted, Defendant's claims of infringement are in essence that Claims 1, 3, 4, 6, and 7 of the '087 Patent are product claims covering the composite structure of the tubing and are infringed by Plaintiff's product.

*The Winston Patent*

Slade's initial efforts, leading to the '087 Patent, consisted of incorporating various metal powders, as well as amounts of carbon black ranging from .01 percent to .2 percent, uniformly dispersed throughout the wall to form tubes of various sizes. The samples were sent to Aeroquip for further testing, and sometime after October of 1960, Raybestos received Aeroquip's purchase order for small production quantities of the carbon black tubes. After production began Slade discovered in January of 1961 that the production tubes had no conductivity and, upon investigation, learned that the reason for the phenomenon was that the blend operator had added carbon black and lubricant simultaneously to the PTFE resin rather than carbon black first and lubricant later.

In conductivity testing to confirm this finding, Slade discovered occasional spots which had very high conductivity and many "barren spots between."

From this finding, Slade conceived and developed the method of mixing carbon black and Teflon,™ called the "salt and pepper" method, which was subsequently incorporated in the patent in suit. The patent notes the failure of PTFE hose due to electrostatic discharge across the polymer wall and notes also that it has been proposed to overcome this problem by incorporating in paste-extruded polytetrafluoroethylene tubing a pulverulent, electrically conductive material, such as carbon black. The patent notes further that adding amounts of electrical material which will permit radial dispersion of electrostatic discharge substantially lowers the resistance of the tube to fuel cracking or fuel seepage while the incorporation of small amounts of carbon black, for example to "about 0.05 percent or less," will reduce fuel cracking "but not measurably increase electrical conductivity radially or longitudinally.... This has been the case regardless of the amount of electrically conductive material employed and the care taken to disperse the electrically conductive material as uniformly as possible throughout the paste and resulting tubing."

The specification describes a process in which the PTFE is divided into two quantities. The electrically conductive particles are mixed with one of the two. The unmixed portion is the typical white PTFE, the "salt" of the mixture. The portion with the particles is referred to as the "pepper." The "salt and pepper" mixtures are then combined. By use of the "salt and pepper" mix, relatively small amounts of carbon black are dispersed in a relatively few smears or layers running longitudinally and separated from each other radially by fiber layers relatively free of electrically conductive material providing "one or more unbroken, electrically conductive paths extending longitudinally of the hose." Exhibit 12,

---

**1.** "Sintering" is a process by which a substance    is subjected to heat.

column 3, lines 36–37. As filed the claims in the application were all directed to the "salt and pepper" method, cast in both product and method forms. Claims directed to composite tubing were first filed on June 10, 1964, after Raybestos-Manhattan became aware that Titeflex had filed an application on a composite hose.

The patent, as issued, contains nineteen claims, all of which are product claims directed to either the extrudate or the finished tubing. Only Claims 1, 3, 4, 6, and 7 are at issue.

Claims 1 through 6 were added to the application by amendment to cover the Titeflex hose, the subject of Patent No. 3,116,688, filed by Rowand and Larose in November of 1962. Claim 7 was added by amendment application filed June 1, 1965, to invoke an interference between the '688 Patent and the '087 Patent.

Claims 4 and 7 are illustrative. Claim 4 describes: "Electrically conductive tubing formed of attached concentric tubular extrusions, the inner tubular extrusion comprising sintered tetrafluoroethylene polymer containing pulverulent, inert, electrically conductive particles, and the outer tubular extrusion comprising sintered tetrafluoroethylene polymer."

What is claimed in Claim 7 is:
A tube of polytetrafluoroethylene and the like for conducting fluids under pressure and including means for discharge of internal electric static electricity to the ends of the tube and grounding the same from the tube interior at said ends in order to maintain the polytetrafluoroethylene tubing performance characteristics, said tubing having an integral polytetrafluoroethylene wall structure with an interior liner portion of a substantially annular conformation from end to end and having a uniform dispersion of electrically conductive particles embedded therein, the major portion of said tubing wall completely surrounding said liner portion exteriorly and being relatively non-conductive in character, said surrounding portion together with said liner containing fluid under pressures uniformly within said tubing."

Claims 1 and 3 are directed to an extrudate of attached concentric tubular extrusions, the inner extrusion comprising PTFE and electrically conductive particles and the outer extrusion comprising PTFE. Claim 6 is directed to electrically conductive tubing formed of attached concentric tubular extrusions of the same description.

The specifications are primarily directed to the use of the "salt and pepper" method to develop longitudinal carbon fibers and all of the patent examples compare (for air effusion and conductivity) "salt and pepper" mixture of the type described with compositions of PTFE and carbon in which all the PTFE is coated. Defendant's claims with respect to composite tubing rest most heavily on the disclosure in column 6, line 45, which states that:

Although tubing produced according to this invention will ordinarily be formed from a preform of paste composition comprising a substantially uniform blend of the "salt" and "pepper" mixes described above because of the ease by which such a preform can be formed, tubing formed from composite preforms are also contemplated. For example, a tubular preform consisting of two concentric tubular charges, the outer of ordinary paste comprising polymer particles, and the inner comprising the paste of this invention, can be extruded to yield an extrudate consisting of two concentric, but attached, tubular extrusions, the inner one containing the conductive fibers according to this invention and the outer being free from such fibers. The resultant sintered tubing will be adequately conductive for longitudinal dissipation of electrostatic charges. In addition, the absence of conductive particles in the outer layer will increase the overall radial dielectric strength of the liner wall and will allow still higher potentials in the liner at the midpoint between metallic end fittings without danger of breakdown. The composite wall will also increase the overall resistance to the "fuel cracking" phenomena, thereby extending the useful life of the tubing under extreme conditions.

As previously noted, the Titeflex patent application, No. 3,166,688 ('688 Patent), was filed by Rowand and Larose in November of 1962. The patent relates to electrically conductive aircraft hose and discloses a composite tubing having an interior liner in which conductive particles, such as carbon black, are uniformly dispersed. The liner is surrounded by an outer layer which is thicker than the inner liner and relatively non-conductive. The "salt and pepper" method is neither used nor disclosed in the '688 Patent.

In July of 1965, the patent office declared an interference with the Rowand (Titeflex) 3,166,688 ('688) patent (which had already issued).

The Rowand structure

is designed to preserve to a large degree the advantages of an opportunity for visual inspection and thus more adequate control in connection with overall inspection and testing procedures. At the same time the tube is designed to provide a definite path for discharge of static electricity from the tube interior. This path is preferably confined to the interior portion of the tube so that the remaining outer portion of the wall forms an excellent electric barrier against arcing to the conventional wire braid armoured sheath.

Since the Slade filing date was earlier than the Rowand application, the burden was on Titeflex to show a reduction to practice prior to the Slade filing date of May 22, 1962. Titeflex failed in its burden and Slade was determined to be the first inventor. Following the termination of the interference favorable to Slade, the examiner on March 12, 1969 deemed the claims directed to the "salt and pepper" method distinct from the product claims added by amendment to the '087 application. Slade was ordered to elect one of the groups enumerated and elected to prosecute the invention defined by the added claims. The claims as originally filed were cancelled[2] and the patent in suit issued in October, 1969. The '087 Patent as limited is the patent which Plaintiff has allegedly infringed.

Essentially, Plaintiff contends that the claims at issue are invalid on the ground that (1) the alleged invention is either anticipated by the prior art or is obvious in view thereof, (2) the invention as defined by the claims were in prior public use or on sale more than one year prior to their assertion, and (3) the claims fail to meet the requirements of 35 U.S.C. § 112 in that they are indefinite and overclaim the alleged invention.

Defendant counters this position by reliance on the presumption of validity of the patent, see Reynolds Metals Co. v. Acorn Building Components, Inc., 548 F.2d 155, 160 (6th Cir.1977), and by the claim that the invention was not obvious given the ordinary skill in the art in 1961 or 1962. Further, Defendant contends that Plaintiff has not proven that there was a prior public use of the invention covered by the claims in question more than one year prior to May 22, 1963, 35 U.S.C. § 102(b), and that the claims are not indefinite when read in the light of the patent specification.

The Court must initially determine therefore whether the claims in suit are violative of sections 102, 103, or 112 of title 35 of the United States Code. If the patent in suit is valid, the Court must determine whether the electrically conductive PTFE tubing manufactured and sold by Plaintiff infringes the patent in suit.

Patentability depends on three factors: utility, novelty, and non-obviousness. 35 U.S.C. §§ 101, 102, 103. For the reasons which follow, I find that the claims at issue would have been obvious to one ordinarily skilled in the pertinent art or, as broadly construed, involve an unpatentable combination of old elements.

The Supreme Court has set forth the relevant factual inquiries which the Court must address concerning obviousness under section 103.

[T]he 103 condition, which is but one of three conditions, each of which must be

2. Slade was later issued Patent No. 3,658,976 on a divisional application directed to a method for producing electrically conductive PTFE tubing using the "salt and pepper" technique.

satisfied, lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unresolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966) (citation omitted).

Thus, the question of obviousness is a mixed question of fact and law requiring express factual findings.

*Presumption of Validity*

■ A patent is presumptively valid, 35 U.S.C. § 282, and the burden of proof of invalidity rests on its challenger. *Universal Electric Co. v. A.O. Smith Corp.*, 643 F.2d 1240 (6th Cir.1981); *Reynolds Metals Co.*, supra, 548 F.2d at 160.

Presumptive validity is weakened, however, when the Patent Office fails to consider pertinent prior art during the prosecution of the patent and

[t]he degree by which the presumption is weakened in cases in which relevant prior art was not considered ... depends upon a balancing of the pertinence of the newly cited prior art and the pertinence of the prior art actually considered by the patent examiner in the prosecution of the patent application.

*American Seating Co. v. National Seating Co.*, 586 F.2d 611, 615 (6th Cir.1978), cert. denied, 441 U.S. 907, 99 S.Ct. 1999, 60 L.Ed.2d 377 (1979) (citations omitted).

Defendant does not contend that Plaintiff's cited references do not constitute prior art, although Defendant submits that referenced prior art from the rubber hose or plastic industry is less pertinent than that of the Teflon™ product field. Both Slade and Plaintiff's expert Mr. Oren Linger acknowledge the relevancy of the rubber art.

Plaintiff relies on twelve prior art patents, two prior art publications, and the prior art black Teflon™ hose of B.F. Goodrich. Four of the prior art patents were cited by the Patent Office Examiner.

With regard to the relative pertinence of the uncited prior art, I credit Mr. Linger's testimony that the most pertinent prior art was the Abbey-Upham Report, which was clearly the tabula rasa for the identification and solution of the problem. Although Defendant contends that the Abbey-Upham Report did not teach the solution to the problem, I find that Abbey-Upham identified the problem, explored the alternatives, and taught the advantages of incorporation of carbon black as the potential solution to dissipation of static electricity in Teflon™ fuel hose. The report was the foundation for both the Slade and Rowand works, and it is more pertinent than the prior art that was before the Patent Office. Also not cited to the patent examiner was the standard black B.F. Goodrich hose which was sufficiently conductive so as not to have experienced field failure and the particularly pertinent Sell patent, No. 2,945,265, issued July 19, 1960. The Sell patent teaches a method for compartmentalizing or partitioning Teflon™ in the preform stage for extrusion purposes, so as to obtain two or more different components each fulfilling its own function. Thus, Defendant is not entitled to the full benefit of the presumption of validity with respect to the claims in issue.

I also credit the testimony of Mr. Linger that the level of ordinary skill in the pertinent art, which I find to be the Teflon™ and rubber hosing art, would be a degree in chemical engineering, or the equivalent thereof, with a substantial amount of experience in the field of extrusions. I weigh Mr. Linger's testimony more highly than that of Defendant's witness Townsend Beaman because, despite Mr. Beaman's involve-

ment as an attorney in the Teflon™ field from its early beginnings, he was primarily an observer of the art, while Mr. Linger had been involved throughout his entire career with product development and construction of airline hoses and, since 1955, with the production of Teflon™ tubing for the aircraft industry (using under license the Resistoflex technology). Mr. Linger was a member of the SAE committee having jurisdiction over technical matter relating to the hydraulic hoses and other components for aircraft fuel systems and as such was a participant in the development and implementation of the military specifications regarding the Teflon™ hose in issue.

*Prior Art Contentions*

Plaintiff contends that the prior art disclosed composite hose structure, tubing of concentric layers of rubber or plastic with one layer made conductive by the use of carbon black, and that the composite structure may contain fillers so that each layer meets a specific need. Plaintiff contends that the only difference in the claims in suit, not expressly disclosed, was the use of Teflon™ to form the composite structure comprising two concentric tubes.

Defendant concedes that carbon black has long been known to have electrically conductive characteristics and that pure Teflon™ was known to be dielectric. Defendant notes, however, that much of Plaintiff's referenced prior art relates to the rubber or plastic field and that none of the prior art suggests, except in hindsight, the solution to the problem solved by the '087 Patent.

As previously recited, broadly stated, the claims disclose either a composite extrudate or tubing having an inner tubular extrusion comprising electrically conductive particles and PTFE, and an outer tubular extrusion comprising PTFE.

The Abbey-Upham Report teaches the use of PTFE and electrically conductive carbon black in tubing. It does not teach away from the broad claims at issue, although it does not suggest composite tubing.

However, composite rubber hose structure is taught in prior art. United States Patent No. 2,781,288, issued February 12, 1957, to K.E. Polmanteer, teaches the use of lamination of alternate layers to take advantage of the physical and/or chemical properties of each. The patent states:

The superiority of organosilicon rubbers over organic rubbers with respect to thermal stability, resistance to weathering and chemical reagents is well known. On the other hand, the superiority of organic rubbers to organosilicon rubbers with respect to stress strain properties and resistance to certain solvents together with the greatly reduced cost of the organic rubber is also well known. For this reason there are many applications in which it would be desirable to fabricate articles partly from organosilicon rubbers and partly from organic rubber. By so doing it is possible to take advantage of the superior physical and/or chemical properties of each material and at the same time produce an article at less cost than organosilicon rubber alone.

The patent teaches the layering of alternate permanently bonded layers of silicon rubber and organic rubber by, among other methods, extruding the respective layers over each other through concentric dies to produce either flat or tubular articles. The Polmanteer patent thus generally disclosed the use of composite hose. The patent in suit likewise discloses a composite hose for the purpose of taking advantage of the superior properties of each.

Indeed, Slade himself prior to filing of the '087 application recognized that "composite walls, as such, are not new. Probably not patentable." Moreover, the Walker patent, No. 2,752,637, issued July 1, 1954, and the Llewellyn patent, No. 2,685,707, issued June 30, 1950, teach the use of carbon black mixed with Teflon™ as an extrusion aid. These patents do not teach composite tubing as do the broad claims of the claims in issue or the concept of electrically conductive hose having inner and outer layers. However, the patents do teach the mixture of PTFE and carbon black, and as Defendant concedes and the introduction to the '087 Patent itself acknowledges, carbon

black was a well-known electrical conductor.

Composite tubing of concentric layers which contains carbon black to make the layer electrically conductive also has long been known. United States Patent No. 2,341,360, entitled "Fire Resistant Electrically Conductive Rubber Article," issued to Douglas Bulgin on February 8, 1944, teaches the formation of fire resistant, electrically conductive articles of rubber, such as sheets or tubing, with "a surface layer of electrically conductive rubber or rubber-like material and a supporting layer of rubber composition which is electrically nonconductive, or relatively so .... The conductive surface layer may be provided with a relatively large proportion of conductive ingredients, generally solid, such as conductive forms of carbon .... In the underlying layer, however, in which there need be little or no conductive material, there is incorporated a large quantity of materials that resist or inhibit propagation of flame."

The patent thus discloses tubing made of two concentric layers of rubber and teaches that one layer should contain carbon black particles to make the layer electrically conductive. It does not teach away from the claims in issue.

Production of composite plastic tubing by extruding two layers simultaneously was also well known. Patent No. 2,501,690, issued March 28, 1950, to W.S. Prendergast is entitled "Method and Apparatus for Making Multiple Layer Plastic Conduits" and discloses a method and apparatus for manufacturing garden hose composed of two layers of plastic material by extruding the layers simultaneously. Each layer is situated to provide its desired properties within the composition, "the inner layer being situated for its resisting characteristics with reference to the substance to be transmitted through the conduit and the outer layer with particular reference to external abrasion."

Patent No. 3,070,132, issued December 25, 1962, to D.S. Sheridan, teaches the extrusion of non-sparking plastic medical tubes using a single strip of electrically conductive material either on the inside or outside of the tube. "[I]t is preferable to form the plastic material for the portion of the new tubes using powdered, electrically conductive carbon. Such forms of carbon are standard items of commerce." This patent also discloses the use of carbon black to impart antistatic characteristics, although the material in question is plastic.

Patent No. 2,863,174, issued December 9, 1958, to R.D. Shuman, is entitled "Production of Preforms and Longitudinally Curved Articles of Polytetrafluoroethylene Resin." The patent teaches the use of composite preforms in order to induce a curved Teflon™ tubing as a result of using segmented preforms of different compositions. Patent No. 2,945,265, issued July 19, 1960, to J. Sell, Jr., also teaches the use of segmented preforms in the Teflon™ art. The invention relates to varicolored insulation wire formed of Teflon™ and teaches the use of a container "shaped as to separate the space in the container into longitudinally extended cavities extending throughout the height of the container."

While the preform in neither of these patents is concentric as is the composite of the claims in issue, they are analogous: in the former, the segments are lengthwise; in the latter, they are circular.

The Abbey-Upham Report, as previously noted, teaches the addition of electrically conductive carbon black to PTFE hose to conduct static electricity generated on the inner surface of the tube. Moreover, it is undisputed that the dielectric properties of unfilled Teflon™ had been known since the original DuPont patent.

*Conclusion of Obviousness*

■ To the extent that the invention claimed can be properly characterized as tubing or extrudate having an inner extrusion comprising electrically conductive particles and an outer tubular extrusion comprising PTFE, each of the elements is obvious from prior art. Defendant does not contest Plaintiff's claim that the patent is a combination patent but rather claims that the composite structure obtained unusual and unexpected results, that is,

of providing Teflon tubing having an inner conductive layer, having sufficient conductivity to dissipate or carry away any buildup of electrostatic charges on the inside of the tubing due to fuel flow there through, embraced and bonded with an outer Teflon layer which was dielectric and provided a barrier against fuel seepage which may have resulted from the addition of carbon black in the inner layer, thus resulting in a new aircraft hose product in which pinhole leaks were eliminated without adversely affecting the desirable fuel seeping or cracking characteristics that are necessary.

The federal courts are divided on the issue of whether synergism is an additional prerequisite to patentability of a combination patent. Several courts of appeals have rejected a synergism requirement and have held that validity is to be determined solely by reference to the issue of non-obviousness required by section 103, as determined by the procedures set forth in *Graham v. John Deere Co.; Rengo Co. v. Molins Machine Co.,* 657 F.2d 535 (3d Cir.), *cert. denied,* 454 U.S. 1055, 102 S.Ct. 600, 70 L.Ed.2d 590 (1981); *Plastic Container Corp. v. Continental Plastics of Oklahoma, Inc.,* 607 F.2d 885 (10th Cir.1979), *cert. denied,* 444 U.S. 1018, 100 S.Ct. 672, 62 L.Ed.2d 648 (1980); *Republic Industries Inc. v. Schlage Lock Co.,* 592 F.2d 963 (7th Cir.1979).

The Sixth Circuit has recognized that the synergism test suffers from definitional difficulties which have "contributed to muddy the patent waters" but has affirmed its view that synergism is a "term symbolizing the more stringent standard for combination patent claims . . . , a symbolic reminder of what constitutes nonobviousness when a combination patent is at issue." *Smith v. Acme General Corp.,* 614 F.2d 1086, 1095 (6th Cir.1980).

It is not necessary to this decision, however, to resolve the question since either standard justifies a conclusion that the combination of these elements simply lacks "the unique essence of authentic contribution" to the Teflon™ art which is the heart of invention. *Id.* The claims of the patent

in suit therefore fail to meet the obviousness standard of section 103.

Obviousness is measured by considering whether a hypothetical person having all the art at hand would have found the same solution when addressing himself to the same problem. I note that it is undisputed that Messrs. Rowand and Larose, at approximately the same time as Slade, with the Abbey-Upham Report before them did, in fact, come to the same solution. Nor is it disputed that the concept of a composite tube was arrived at independently in December of 1962 by B.F. Goodrich, Resistoflex, and Titeflex in connection with tests conducted at Titeflex.

A person in the Teflon™ art would have had knowledge of the segmented preform use, of the use of carbon black as an electrical conductor, of the need to place carbon black on the inner liner of the tube where static was generated, and of the dielectric strength of pure Teflon™. I conclude that the only differences between the claims and the prior art which is not specifically shown is the use of Teflon™ in concentric tubes and the "salt and pepper" method of formation of the inner tube. I credit Mr. Linger's testimony that the tubing itself would have been obvious to one of ordinary skill in the art.

Defendant also contends that as to the broad claims the Court should weigh secondary considerations to patentability, such as the ability of the '087 hose to meet military specifications for conductivity. These allegations need not be considered. In a close case such matters may tip the balance in favor of patentability but "those matters 'without invention will not make patentability.'" *Anderson's-Black Rock, Inc. v. Pavement Salvage Co.,* 396 U.S. 57, 61, 90 S.Ct. 305, 308, 24 L.Ed.2d 258 (1969) (citing *A & P Tea Co. v. Supermarket Corp.,* 340 U.S. 147, 153, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950)).

Therefore, having concluded that the claims as broadly construed are clearly obvious, secondary considerations need not be considered.

Finally, I credit the testimony of Mr. Linger that the only non-obvious difference between the claims in suit and the prior art is the process described as the "salt and pepper" mix concept of producing electrically conductive Teflon™ tubing. The invention over prior art of the '087 Patent is the method of processing the "salt and pepper" mix which when extruded produces a characteristically different and longitudinal orientation of carbon fibers.

Plaintiff's process does not employ the "salt and pepper" method and hence does not infringe upon the invention of the '087 Patent. The Stratoflex tube mixes carbon black with PTFE and distributes it throughout the wall thickness.

For the foregoing reasons, the Court concludes, first, that, as broadly construed, Claims 1, 3, 4, 6, and 7 are invalid for obviousness and, second, that Claims 1, 2, 4, 6, and 7 are not infringed.

Accordingly, judgment will enter in favor of Plaintiff Stratoflex.