LIBBEY–OWENS–FORD CO.; Leybold-Heraeus, GmbH; and Leybold-Heraeus Vacuum Systems, Inc., Plaintiffs,

v.

The BOC GROUP, INC., Defendant.

Civ. A. No. 80–1568.

United States District Court, D. New Jersey.

March 2, 1987.

John E. Lynch, Stephen B. Shear, Felfe & Lynch, New York City, John G. Gilfillan, III, Carella, Byrne, Bain & Gilfillan, Roseland, N.J., for plaintiffs.

Sidney David, William L. Mentlik, Marvin S. Gittes, Lerner, David, Littenberg, Krumholz & Mentlik, Westfield, N.J., Larry R. Cassett, The BOC Group, Inc., New Providence, N.J., for defendant.

## OPINION

HAROLD A. ACKERMAN, District Judge.

This case has had a tortuous and protracted life, having commenced in 1980. Trial on the issues at hand did not begin until May of 1985 and was heard as the court schedule permitted. It was completed in December of that year. I am pleased to now put those issues to rest.

This was a consolidated action brought by Materials Research Corporation ("MRC"), Libbey-Owens-Ford Company ("LOF"), Leybold-Heraeus, GmbH ("LH") and Leybold-Heraeus Vacuum Systems, Inc. ("LHVS") against the BOC Group, Inc. ("BOC") seeking a declaratory judgment that United States Patent No. 4,166,018 is invalid and unenforceable.

The plaintiffs claim that the Chapin patent is invalid because it lacks novelty under 35 U.S.C. § 102, and regardless of novelty would have been obvious to a person of ordinary skill in the art, making it unpatentable under 35 U.S.C. § 103. The plaintiffs claim further that the patent is unenforceable because it was obtained as a result of inequitable conduct before the Patent and Trademark Office ("PTO"). Finally, the plaintiffs claim that the patent incorrectly names Chapin as the sole inventor, rendering it invalid under 35 U.S.C. § 102(f).

These claims present mixed questions of law and fact. They have been presented to the court for final adjudication. 28 U.S.C. §§ 2201-02 (1982).

The opinion below sets out findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a). My findings and conclusions are based on the testimony heard at trial, the exhibits in evidence, and the applicable law, including the United States patent laws, Title 35 of U.S. Code. The parties have aided the court tremendously with their proposed findings of fact and conclusions of law and their critiques of each other's proposals.

I. Factual Background

A. Parties

Plaintiff LOF is an Ohio corporation having a place of business at 811 Madison Avenue, Toledo, Ohio 43695.

Plaintiff LH is a West German corporation having a place of business at 25 Wilhelm-Rohn Street, d–6450 Hanau 1, West Germany.

Plaintiff LHVS is a Delaware corporation having a place of business at 120 Post Road, Enfield, Connecticut 06082.

Defendant BOC is a Delaware corporation having a place of business at 85 Chestnut Ridge Road, Montvale, New Jersey 07645. BOC, formerly named Airco, Incorporated ("Airco"), is a wholly owned subsidiary of The BOC Group plc, a company organized and existing under the laws of England and having a place of business at Hammersmith House, London, England.

Defendant BOC is the present owner of United States Letters Patent No. 4,166,018 ("the Chapin patent" or " '018 patent") entitled "SPUTTERING PROCESS AND APPARATUS" which issued on August 28, 1979 to Airco as assignee of John S. Chapin.

The Chapin patent describes and claims a device for coating objects with a very thin film of material. It also states a claim on the coating process, which uses the physical phenomenon of "sputtering". The sputtering application most thoroughly discussed at trial was the manufacture of tinted or reflective architectural glass, the type of large plate glass that forms the exterior of many buildings. Through the claimed process, these pieces of glass are coated with a thin layer of metal. The metal used depends on the color desired. Other applications range from coating the plastic tops of perfume bottles with a decorative layer of metal to coating machine tools with a thin layer of especially durable but expensive metal.

Plaintiffs LH and LHVS have been and are now engaged in the business of selling sputtering apparatus in the United States. LH and LHVS are designing and selling sputtering equipment for use in the semiconductor industry. This equipment is used to coat micro-chips and related devices. LH and LHVS are also designing and selling sputtering equipment for use in the glass coating industry. This equipment is used to coat large pieces of architectural glass. Plaintiff LOF has purchased and used sputtering equipment made by LH to coat architectural glass in the United States.

Originally, there were two actions brought by separate groups of plaintiffs for declaratory judgments that the Chapin patent was invalid and unenforceable and not infringed by the plaintiffs. (Civ. Action Nos. 80–648 & 80–1568). The plaintiffs also stated claims of patent misuse. The defendant raised counterclaims of infringement against all plaintiffs. On December 16, 1980, the cases were consolidated solely on the issues of validity and enforceability. (Order 12/16/80). The claims of infringement, which were different as to each plaintiff, were bifurcated and discovery on those issues stayed pending outcome of this action. On the first day of trial the plaintiffs dropped without prejudice their claim of patent misuse.

Prior to trial, Judge Biunno, to whom the case was at that time assigned, denied the plaintiffs' motion for summary judgment on the validity of the patent in an opinion dated September 13, 1983. Subsequently the case was reassigned to me. A trial without a jury was held in 1985 on the following dates: May 21, 23, 24, July 12, 15 through 18, September 4 through 6 and December 10.

The Materials Research Corporation ("MRC") was a plaintiff in this action, but following the complete trial on the merits and submission by the parties of proposed findings of fact and conclusions of law, including critiques of each other's proposals, MRC settled its dispute with The BOC Group. (Civ. Action No. 80–648). MRC agreed that several of its sputter coating devices infringed the '018 patent. An order issued on June 10, 1986 permanently enjoining MRC from making, using or selling planar magnetron sputter coating apparatus which infringes any claim or claims

of the '018 patent. The order expressly stated that it could not be cited against third parties as an adjudication of the contested issues as to invalidity or infringement.

Several patents and technical publications were admitted into evidence as prior art to the Chapin patent. Both sides presented expert testimony evaluating this prior art. Other testimony and documentary evidence was presented on the issues of inequitable conduct before the PTO and the commercial success of the Chapin patent. Finally, the record was supplemented with the deposition testimony of several individuals.

### B. Sputtering

Sputtering is a physical phenomenon in which a negatively charged electrode is disintegrated by positively charged gas ions violently colliding with it. This disintegration produces a shower of electrode particles which coats objects placed in their path.

The Chapin patent claims an apparatus and method for depositing a thin film of sputtered material such as copper on objects such as glass, plastics and semiconductor devices using the technique of sputtering. The objects to be coated are referred to as substrates.

Sputtering is a well-known phenomenon. It was observed and described as early as 1852 in England by R.W. Grove. While studying the physics of electrical discharges, Grove noticed a metallic deposit on the glass walls of a discharge tube. It was some fifty years later when E. Goldstein, a Dutch physicist, presented compelling evidence that this sputtering effect was caused by positive ions produced in the discharge hitting the negatively charged electrode or cathode, disintegrating it, and depositing its remnants on the glass. Some thirty-five years later, F.M. Penning, another Dutch physicist, investigated the use of magnetic fields for improving the performance of glow discharges (the visible or light emitting portion of a gaseous discharge) and for constructing a sputtering device. It was not until the work of G.K. Wehner in 1956, that a systematic experimental study of sputtering occurred.

### C. Sputter Coating Devices

One of the simplest forms of a sputter coating device is a diode sputtering device. This device consists of two parallel metal plates placed a few inches apart within a vacuum chamber. The chamber is evacuated and refilled with argon gas at a pressure of approximately $10^{-1}$ torr. A d.c. voltage of about 2,000 volts is applied between the plates. A glow discharge develops and an electric current flows through the gas. Substrates placed at or near the anode will be coated with atoms sputtered from the cathode.

The d.c. diode has many disadvantages. The most notable is that electrons frequently reach the anode before their energy is exhausted. The anode is removing electrons which still have sufficient energy to ionize gas atoms. The failure to effectively prevent these electrons from reaching the anode too quickly reduces the sputtering output.

The Dutch physicist F.M. Penning found that the ionizing efficiency of electrons in a glow discharge can be greatly enhanced by applying a magnetic field perpendicularly to the electric field which exists between the cathode and anode. A magnetic field deflects moving electrons by forcing them to move in a spiral path around the magnetic field lines. Under these conditions, the electrons must travel a greater distance before they reach the anode. This longer path enhances the probability of ionizing collisions with argon gas atoms.

Mr. Penning was issued United States Patent No. 2,146,025, on February 7, 1939. The Penning patent describes and claims a magnetically enhanced sputtering device in which the cathode is a cylindrical rod or post and the anode is a hollow cylinder surrounding the cathode. The electric field lines are directed radially into the cathode. The magnetic field lines are directed parallel to the cathode and perpendicular to the electric field lines.

In Penning's patented configuration the electrons on the periphery of the device are influenced much more by the magnetic field than by the electric field. They travel in a spiral fashion along the magnetic field lines and as a result, some of them are not trapped but are lost at the ends of the cathode. Electrons and the associated plasma influenced by the magnetic field drift around the area surrounding the cathode and escape from the sides of the device. The escaping plasma is visible to the naked eye. Observers of this phenomenon have attempted to constrain the plasma by configuring the cathode to seal off areas from which it escaped. This solution employs what is known as the "hollow cathode effect". The term derives from the operation of a cylindrical cathode sputtering device in which an electron in a plane perpendicular to the cylindrical axis always encounters the repulsive force of the negatively charged surface. This term has been used at trial as shorthand for the physical fact that like charges repel.

Penning's solution to prevent plasma loss was to attach a flange or wing to each end of the post cathode. The magnetic field lines crossed both wing portions of the cathode at right angles. As a result the electrons which travelled along the magnetic field lines were reflected back and forth by the wings.

Various examples utilizing the hollow cathode effect are in the prior art. Penfold, following Penning, used wings associated with hollow and post cathodes to confine the plasma around the cathode. Mullaly constructed a hemispherical cathode with a quadrupole magnetic field arrangement to prevent the escape of secondary electrons and the associated plasma. In contrast, Eric Kay used a quadrupole magnetic field arrangement with a flat cathode in a device where the plasma would have escaped along the magnetic field lines. Mullaly sealed off this escape route by molding the cathode in the shape of a hemisphere which intersected the curvilinear lines of the quadrupole magnetic field.

### D. Chapin's Work

Dow Chemical Company in Rocky Flats, Colorado, was engaged in research and development of thin film coating processes as early as 1957. This research covered a wide range of coating techniques including various types of sputtering. The Research Group Manager at Dow in this field was Mr. Theodore Van Vorous.

Work with quadrupole magnetic fields was initiated in 1964 and 1965 by Dow and involved both coating thin films and the sputter cleaning of surfaces. In sputter cleaning the objective is to remove surface impurities from the target using sputtering techniques. This project was eventually transferred to Van Vorous' research group.

At this point Mr. James Mullaly joined Van Vorous' group at Rocky Flats. He had already developed his hemispherical cathodes and in this project he and Van Vorous attempted to increase sputter coating rates using trough-shaped cathodes with and without magnetic enhancement. These targets were shaped like rain gutters and employed the hollow cathode effect. In all cases the magnetic fields used were quadrupole fields.

After nearly a man-year of experimentation, Mullaly and Van Vorous developed a trough-shaped magnetically enhanced cathode target with side walls angled at approximately fifteen degrees from the vertical.

In 1969, Van Vorous and Mullaly left Dow and formed Vacuum Technology Associates ("VTA"). At about that same time, Mr. John Chapin started work at Dow in Rocky Flats as a Coating Engineer. Mr. Chapin had received a Bachelor of Science degree in Geophysical Engineering in 1963 from the Colorado School of Mines and a Master of Science in Electrical Engineering in 1969 from the University of Colorado.

While at Dow, Mr. Chapin learned of the prior work conducted utilizing quadrupole magnetic fields in conjunction with planar and hemispherical cathodes to achieve high rate sputtering.

On September 1, 1972, Airco contracted with VTA to have them develop a high rate

sputter coating system. The objective was a system capable of a deposition rate of 30,000 angstroms per minute of copper, 10,000 angstroms per minute of aluminum and 15,000 angstroms per minute of chromium.

Shortly after entering the contract with Airco, Van Vorous hired Chapin as Manager of Research and Development for this project. Initially Van Vorous told Chapin to develop an elongated cathode similar to the elongated trough device from Dow. Chapin had already constructed a trough device after discussing the Airco project with Van Vorous before leaving Dow. At VTA Chapin built a modified trough-shaped cathode with adjustable sides which could be lowered to form a planar cathode. He wanted to determine whether the sides were necessary to contain the plasma or whether using magnets alone would suffice.

With the completely planar cathode, Chapin placed an electromagnetic coil behind the cathode such that the magnetic field lines emerged from and re-entered the cathode. This arrangement of a planar cathode and an electromagnetic coil formed a closed loop magnetic tunnel over the cathode. The result was a confinement of the electrons emitted during the sputtering process in an endless path of travel. Chapin also added pole pieces to the electromagnetic coil further concentrating the magnetic field. This concentrated field insured that more magnetic field lines exited and re-entered the planar cathode.

By January 1973, Chapin reported that a completely flat cathode had been built and tested. The anode at this stage was a quarter inch rod positioned one inch above the center of the cathode. The anode itself was in the path of sputtered particles travelling to the substrates. This resulted in uneven coatings as the film building up on the anode, flaked off, and fell on the substrate. Chapin prepared a "Record of Invention" dated February 22, 1973 covering the construction of both an elongated trough-shaped cathode and a flat cathode sputter coating device.

In his February 1973 progress report, Chapin stated that the flat cathode design described in his January 1973 report appeared promising and by extrapolating data from a prototype predicted a rate of 30,000 angstroms per minute for copper at a sufficient power level. He was awaiting a stronger power supply from Airco in order to test his hypothesis.

In operation, the combination of the planar cathode and magnetic field arrangement designed by Chapin produced a narrow erosion region on the target surface. This new cathode and magnetic field combination achieved high rate sputtering and Chapin recognized that he had a successful initial design for the Airco project.

Chapin's work was first publicly introduced in the Vacuum Technology section of the January 1974 issue of Research and Development Magazine. Chapin published an article entitled "The Planar Magnetron—A New Source Joins Triodes and Cylindrical Magnetrons for Rapid Deposition of Materials by Sputtering." In the article he displayed a solution to his anode flaking problem. This design had an anode which was positioned outside the perimeter of the cathode and slightly above it.

E. History of the Patent Prosecution

In the first action in the United States Patent Office, on September 10, 1974, the Chapin patent application was rejected as obvious based on two patents by Clarke (U.S. Patent nos. 3,711,398 & 3,616,450). The claims were subsequently limited to planar configurations with a closed loop magnetic trap.

In the second office action, on June 13, 1975, the examiner rejected all the claims as directly anticipated by the Corbani patent (U.S. No. 3,878,085). On October 31, 1975 Airco called for an interference with the Corbani '085 patent. At that time Airco copied only the single claim of the Corbani patent they believed patentable having both a planar cathode and a closed loop magnetic trap.

On October 18, 1978 the Patent Board of Interferences awarded Chapin priority over Corbani and the application was sent back

to the examiner for further *ex parte* proceedings.

In December of 1978 Airco amended its claims to include the anode limitation and submitted supplemental prior art including the Knauer patent to the PTO. The PTO granted Chapin a patent on August 28, 1979.

### F. The Chapin Patent

The Chapin patent claims an apparatus used to sputter-coat substrates and the process using that apparatus. The patent describes in general terms a structure which employs magnets located behind a flat cathode on which the sputtering takes place. An anode is located at the side and around the periphery of the cathode so that it is out of the path of the sputtered particles traveling to the substrate.

A magnetic field is formed adjacent to the planar target with arching lines of magnetic field entering and exiting from the target surface. The magnets are located behind the target so as to form a closed loop resulting in a racetrack erosion region on the sputtered surface of the target. When sputtering is used to coat substrates, they are placed in the path of the ejected atoms. These atoms collide with the substrate and form a "thin film" coating on it.

Claims 1 through 10 of the patent are apparatus claims and claim 11 is a process claim. Claim 1 is the broadest claim covering the apparatus. The text of claim 1 is set out below:

> Apparatus for coating a substrate by sputtering comprising a cathode defining a substantially planar sputtering surface comprised of material to be sputtered, magnet means for producing a magnetic field having lines of flux which extend in a curve from said sputtering surface and return thereto to form an endless arch over a closed loop erosion region on said sputtering surface, an anode positioned to produce an accelerating electric field adjacent said sputtering surface for producing a glow discharge confined by said magnetic field to the region adjacent said sputtering surface and within said closed loop endless arch, said anode being out-

side the zone of glow discharge confinement and out of the path of travel of sputtered particles moving from the sputtered surface to a substrate, and means for connecting said cathode and said anode to a source of electrical potential.

Claims 2 through 4 are dependent on claim 1. They incorporate claim 1 with limitations on it defining various geometries of the erosion region. Claim 5 is a dependent claim which limits the magnet of claim 1 to an electrical coil. Claim 6 is a dependent claim which limits the device in claim 1 to operating with the cathode at a potential below ground and the anode above ground.

Claim 7 is an independent claim which begins with a preamble stating what is known in the prior art and then makes a claim to an improvement. Claim 7 states:

> In electric glow discharge sputtering apparatus for coating a substrate by the progressive disintegration of a cathode by positive ion bombardment in a low pressure environment, the improvement which comprises a cathode having a substantially planar disintegration surface, a magnet structure oriented with respect to said planar cathode to cause the magnetic flux lines emanating from such magnetic structure to project into the space adjacent the disintegration surface of the planar cathode and to intercept a finite closed loop portion of said surface to confine the glow discharge plasma to a closed loop region immediately adjacent the planar disintegration surface, and an anode outside the region of plasma confinement and out of the path of travel of sputtered particles moving from the sputtering surface to a substrate.

Claim 8 is an independent claim which differs from claim 1 in that it refers to electrodes rather than the anode or cathode. It also adds that operation is to take place in a low pressure environment. Claim 9 is an independent claim which differs from claim 1 by specifying that the device be operated in a vacuum chamber in which substrates are also placed. In addition, claim 9 also requires the magnets to

have pole pieces. Claim 10 is considerably more narrow than claim 1. It describes and claims a magnet system including pole pieces and rather than use the term "glow discharge" it uses "ionized gas".

## II. Jurisdiction and Venue

The court has subject matter jurisdiction over this action. The plaintiffs' request for a declaratory judgment on the validity of the Chapin patent presents a federal question, as it arises under the patent laws of the United States. 28 U.S.C. §§ 1331, 2201, 2202. The district courts have exclusive jurisdiction over suits involving patents. 28 U.S.C. § 1338(a). This court has personal jurisdiction over the defendant Airco as a corporation doing business in New Jersey, and since Airco is the sole defendant venue is proper. 28 U.S.C. § 1391(b).

## III. Plaintiffs' Claims

The plaintiffs make three distinct claims: the Chapin patent is invalid because it does not satisfy the statutory standards for patentability, the patent is invalid because it incorrectly names Chapin as the sole inventor, and the patent is unenforceable because it was obtained through inequitable conduct before the Patent Office. I shall consider each claim in turn, separately stating findings of fact and conclusions of law necessary to the resolution of each claim.

### A. Patentability

A patent is a grant by the United States to the patent owner of the right to exclude others from making, using, or selling the patented invention for a period of seventeen years. Congress is empowered to grant this monopoly "to promote the progress of science and useful arts." U.S. Const. Art. I, § 8, cl. 8. In order to justify this grant the invention must be new, useful, and non-obvious. 35 U.S.C. § 101 states:

Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to

the conditions and requirements of this title.

Section 102 of this title describes the circumstances in which an inventor will have lost his right to a patent because his invention is not novel.

Section 103 states:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negated by the manner in which the invention was made.

1. Obviousness

Judicial standards for determining obviousness were set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966).

Under section 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or non-obviousness of the subject matter is determined.

The focus of this court's determination of the obviousness issue centered on whether the challenger has carried his burden of proving by clear and convincing evidence the patent's invalidity, not whether the court believes the invention is patentable. *See Panduit v. Dennison Manufacturing*, 774 F.2d 1082, 1090 (Fed.Cir. 1985), *vacated on other grounds*, —— U.S. ——, 106 S.Ct. 1578, 89 L.Ed.2d 817 (1986).

The determination of obviousness under § 103 "is a question of law based on the underlying factual inquires set forth in *Graham*." *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 872 (Fed.Cir.1985). I have set out below my determination of the scope and content of the prior art and a comparison of that art with the Chapin patent. In addition, I have examined the

so-called "secondary considerations" associated with the Chapin patent.

An issued patent is presumed valid, and the burden of establishing invalidity is on the party asserting it. 35 U.S.C. § 282. Section 282 states (in part):

A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

■ Decisions of the Court of Appeals for the Federal Circuit are binding precedent on issues of patent law.

Strange as it may seem to any district judge not to be governed by the precedents of his own Court of Appeals, that is the situation created by Congress in the Federal Courts Improvement Act of 1982, (citation omitted), in the interest of promoting a uniform patent law by having only one Court of Appeals deciding questions of patent law

. . . . .

*Titanium Metals Corp. v. Banner,* 778 F.2d 775, 779 (Fed.Cir.1985). The Federal Circuit was granted exclusive jurisdiction on appeals from the district courts where jurisdiction of that court was based in whole or part on 28 U.S.C. § 1338. *See* 28 U.S.C. § 1295.

The Federal Circuit has determined the standard to be followed as pertains to the presumption of validity by the district courts as follows:

The statute mandating a presumption of validity, 35 U.S.C. § 282, places the burden of proving facts compelling a conclusion of invalidity on the party asserting invalidity. This court has said the burden of proving facts compelling a conclusion of patent invalidity must be carried by clear and convincing evidence. *SSIH Equipment, S.A. v. United States International Trade Commission,* 718 F.2d 365, 375 (Fed.Cir.1983). The role of the court is to determine whether the validity challenger carried that burden.

*Panduit Corp. v. Dennison Manufacturing Co.,* 774 F.2d 1082, 1096 (Fed.Cir. 1985), *vacated on other grounds,* — U.S. ——, 106 S.Ct. 1578, 89 L.Ed.2d 817 (1986).

The Supreme Court defines clear and convincing evidence as proofs which "place in the ultimate factfinder an abiding conviction that the truth of [the] factual contentions are 'highly probable'." *Colorado v. New Mexico,* 467 U.S. 310, 316, 104 S.Ct. 2433, 2437, 81 L.Ed.2d 247 (1984).

■ Where there is new prior art not considered by the examiner the court must independently determine its effect on patentability. *American Hoist & Derrick Co. v. Sowa & Sons,* 725 F.2d 1350, 1359–60 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984).

■ "Where the party asserting invalidity must rely upon a combination of prior art references to establish invalidity, that party bears the burden of showing some teaching or suggestion in these references which supported their use in combination." *Ashland Oil v. Delta Resins & Refractories,* 776 F.2d 281, 293 (Fed.Cir.), *cert. denied,* — U.S. ——, 106 S.Ct. 1201, 89 L.Ed.2d 315 (1985). The mere fact that a reference could be modified to produce the patented invention would not make the modification obvious unless it is suggested by the prior art. *In re Gordon,* 733 F.2d 900, 902 (Fed.Cir.1984).

■ The relevant prior art to be considered in determining whether an invention is obvious to a person with ordinary skill in the art must (1) be within his field of endeavor and (2) be pertinent to the problem the inventor was trying to solve. *Stratoflex v. Aeroquip Corp.,* 713 F.2d 1530, 1535 (Fed.Cir.1983). Applying *Stratoflex* in this case, the question becomes whether one skilled in the art attempting to build a sputter coating device could be expected to look for guidance in the vacuum pumping art. The determination of what is and what is not analogous art is a question of fact. *See Shatterproof Glass Corp. v.*

*Libbey-Owens Ford Co.*, 758 F.2d 613 (Fed. Cir.), *cert. dismissed*, —— U.S. ——, 106 S.Ct. 340, 88 L.Ed.2d 326 (1985).

■ Finally, objective or secondary evidence of non-obviousness must be considered by the court.

> Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

*Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966). While this language implies that the court has discretion in weighing secondary considerations, the Federal Circuit Court of Appeals has stated:

> [i]t is jurisprudentially inappropriate to disregard any relevant evidence on any issue in any case, patent cases included. Thus evidence rising out of the so-called "secondary considerations" must always when present be considered en route to a determination of obviousness. Indeed, evidence of secondary considerations may often be the most probative and cogent evidence in the record. It may often establish that an invention appearing to have been obvious in light of the prior art was not. It is to be considered as part of all the evidence, not just when the decisionmaker remains in doubt after reviewing the art.

*Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d at 1538–39 (citations omitted).

### a. Findings of Fact

#### i. Person of Ordinary Skill in the Art

The experts for both parties agree that the person of ordinary skill in the art at the time of the invention would have had an undergraduate degree in physics or electrical engineering or the equivalent thereof in practical experience and several years of practical experience in sputtering technology. (Tr. 1264–65, 1801).

#### ii. Prior Art

The plaintiffs principally relied at trial and in their proposed findings of fact and conclusions of law on six prior art references which they contend render the Chapin invention obvious to one of ordinary skill in the art. The content of each reference is considered below followed by a comparison between each and the Chapin claims. The two patents of Penfold and Thornton (U.S. pat. no. 3,884,793, hereinafter "Penfold I" and 4,041,353, hereinafter "Penfold II") are considered together since they share a common origin and are interrelated. The Penfold II application (Ser. No. 254,504) began as a continuation-in-part of Penfold I. Application Ser. No. 254,504 was abandoned and the Penfold II patent issued from a continuation of the abandoned 254,504. *See* 37 C.F.R. § 1.62 (1985). The two technical publications by Mullaly (Plaintiffs' exhibit 32 and 35) are also considered together. The papers describe the same research work but are slightly different. The parties agree that the difference between the papers is irrelevant to the suit. *See* Defendant's Finding No. 78 and Plaintiff's Critique. The Mullaly papers and the Knauer patent (U.S. pat. no. 3,216,652) were considered by the patent examiner during the prosecution of Chapin's patent in the PTO.

#### (a.) Description of the prior art

##### (1). Penfold patents

Penfold I was filed on September 7, 1971 and issued to Telic Corporation as assignee of the named inventors Alan S. Penfold and John A. Thornton. (Defendant's exhibit 112). The patent is entitled "Electrode Type Glow Discharge Apparatus". Penfold I describes a sputter coating apparatus in a direct current (d.c.) operation.

Penfold II was filed on December 23, 1974 and also issued to Telic Corporation as assignee of Penfold and Thornton. The patent is entitled "Glow Discharge Method and Apparatus" and was originally filed on May 18, 1972, thus constituting prior art to the Chapin patent.

Penfold II describes sputter coating devices with split electrodes having two basic geometries, cylindrical or planar, and connected to a special alternating current power supply known as a radio frequency or r.f. power supply. Radio frequency alternating current power sources differ from

the common alternating current (a.c.) power that is supplied by the local utility to its customers. Each lead from an a.c. power source (*e.g.*, a wall socket) alternates between positive and negative potential 60 times a second. The leads from a r.f. power supply alternate between positive and negative in the range of millions of times a second.

Penfold I combines magnetic fields and cathodic surfaces to trap electrons near the target surface. The plasma created by this trap occupies a cylindrical region about the target. The patent specifications depict two principle illustrations, or embodiments, both of which operate with d.c. power sources and have cylindrical geometry. The embodiments of Figs. 1–3 (Appendix page 1) are post cathodes with upper and lower flanges (Fig. 2: 14a, 14b) (App. p. 2). In these embodiments, the plasma is generated on the outside of the cylindrical cathode.

The embodiment of Figs. 4–5 (App. pp. 2–3) in Penfold I is a hollow cylindrical cathode (Fig. 4a: 214) with two inward flanges (214a, 214b). In this embodiment, the plasma is generated within the cylindrical cathode.

While the embodiments illustrated in the patent figures are built for d.c. operation, the patent states that alternating current or r.f. operation may be utilized. The patent states that r.f. operation is achieved by separating the cathode into two parts, providing insulation between the parts and connecting them to an appropriate r.f. power source.

In the r.f. sputtering systems which preceded Dr. Penfold's work, one lead from the power supply was connected to the sputtering target while the other lead was frequently connected to the walls of the vacuum chamber. Sputtering of the vacuum chamber walls results during that portion of the cycle when the walls are negatively charged. In designing the embodiments of the sputter-coating apparatus disclosed in Penfold II, Dr. Penfold testified that it was his intention to build dual electrode systems in which each electrode would function as both anode and cathode

during the r.f. cycle to eliminate the inefficient sputtering of the vacuum chamber walls.

Penfold II, like Penfold I, combines magnetic fields with electrode surfaces to trap electrons near the target. The embodiments of Penfold II are described with respect to r.f. operation and in several instances, with the notable exception of the planar configurations in fig. 7 (App. p. 6), constitute the r.f. analog of the embodiments in Penfold I.

The Penfold II patent states that most of the electrons with sufficient energy to ionize gas atoms are contained in the trap. Dr. Penfold at trial stated that "there are instances, whole periods of time in which the trap is effectively not closed." (Tr. 1989).

In figs. 1–3 (App. pp. 3A–4) of Penfold II, a split post electrode is depicted. Figs. 2a–2b show the magnetic field lines exiting from one electrode half and re-entering the other. In fig. 2c, over each half of the post target the magnetic field lines exit and reenter the same electrode.

Similarly, figure 5a (App. p. 5) illustrates the hollow electrode analog of the post configuration shown in figures 2a and 2b, again with the magnetic field lines exiting one half and reentering the other. Figure 5b illustrates the hollow electrode counterpart of the post configuration shown in fig. 2c and depicts separate magnetic fields over each electrode.

In the configuration illustrated in figs. 7a and 7b (App. p. 6) of Penfold II, a flat or planar circular electrode is split in half with an air or insulation gap between the two halves. A magnet is placed above the split flat electrode and configured so as to produce an arched magnetic field which exists the electrode surface and then reenters the electrode surface. This configuration does not form an endless tunnel because the target is discontinuous.

In the configuration illustrated in figs. 7c and 7d a flat or planar circular electrode is separated by an annular spacing forming a disk surrounded by a washer-shaped section. A magnet is positioned above the

split planar electrode and is configured to produce magnetic field lines which exit from one electrode and reenter the other. This magnetic field spans the insulation gap.

Dr. Penfold testified that he never actually built either of the figure 7 embodiments illustrated in Penfold II. He did build embodiments corresponding to figures 5a, 5b, 6a and 6b (App. p. 5). He found, however, that the results obtained from those embodiments were poor. (Tr. 1736–37, 1754). He determined that the traps were continuously broken during operation. In a practical sense Penfold's approach using the configurations in figures 5 and 6 produced discouraging results.

Generally, the Penfold II r.f. embodiments and their d.c. counterparts in Penfold I differ in that the d.c. cathode has been split and an insulator inserted in the gap to permit each electrode to alternate between positive and negative electrical potentials. Thus, the plaintiffs argue, Penfold I and II teach that with appropriate manipulation one can reconfigure a d.c. device into a r.f. device or a r.f. device into a d.c. device. The plaintiffs stress this point in an attempt to convince the court that a person of ordinary skill in the art would combine Penfold I and II to produce the Chapin patent.

The defendant contested these assertions by citing the following portions of Penfold I and II.

[A]n apparatus is desired which permits an intense glow discharge to be maintained over the target surface at low pressures.... The prior art suggests, for example, a magnetic field to restrict the motions of ionizing electrons.... These devices provide significant improvements in performance, [h]owever, *they suffer the disadvantage of having planar geometries* in which it is found difficult to maintain a uniform ion current distribution; that is, sputtering rate over the cathode (target) surface. Additional improvements in performance can be expected when magnetic fields are used with devices having a cylindrical cathode wherein the axis of the cathode

parallels the field lines. (Penfold I patent, col. 2, lns. 48–66) (emphasis added). Most of the prior art r.f. sputtering devices have involved the use of planar target configurations ... and some sputtering devices have made use of externally applied magnetic fields. (Penfold II patent, col. 3, lns. 18–22).

In addition, the defendant correctly pointed out that Penfold I cautions against using planar targets in the d.c. mode, and suggests using geometries that cooperate with the magnetic field lines. Dr. Penfold testified that he never attempted to build the planar embodiments in Penfold II after obtaining unsatisfactory results from the cylindrical devices he built.

### (2). Knauer patent

United States Patent No. 3,216,652 was issued on November 9, 1965 to Wolfgang Knauer. Knauer's patent describes and claims an ion pump. Knauer's ion pump is a magnetically enhanced sputtering apparatus employing a Penning-type discharge to remove gases. The Knauer patent explains that the purpose of the magnetic field is to trap the electrons, which increases their chances of colliding with the gas atoms to be removed. Ion pumps operate by either reactive sputtering—chemically combining molecules of a reactive gas like oxygen with the sputtered metal—or by ion burial—removing gas atoms by physically burying them in the cathode.

The Knauer patent in figure 2 (App. p. 7) shows a cross-sectional view of a double-ended sputtering configuration. It depicts a system with two targets (18) sputtering into two separate portions of a chamber (8). Each chamber has a flat or planar cathode (18) positioned above an annular magnet (22) immediately adjacent to the cathode. The magnet shown is a permanent magnet (as opposed to a coil) with pole pieces (24, 24'). The magnetic field lines exit and reenter the cathode surface above the pole pieces forming a closed loop magnetic arch. The magnetic field lines depicted as dashed lines closely conform to the geometry of the anode. (12, 12'). Figure 9 (App. p. 8) of the patent is similar to figure 2 (App. 7)

but rather than a permanent magnet it shows a coil with pole pieces.

The embodiments of both figs. 2 and 9 of Knauer thus have a magnet placed directly behind a flat cathode and are configured to form a closed loop trap over the cathode resulting in an endless closed loop magnetic field above the cathode.

(3). Wasa and Hayakawa patent

Japanese Patent Publication No. 46–34605 ("Wasa and Hayakawa patent"), dated October 11, 1971 was issued to Matsushita Denki Sangyo K.K. as assignee of the inventors Wasa and Hayakawa.

The Wasa and Hayakawa patent discloses several embodiments, each including a flat cathode facing a flat anode. Substrates to be coated are placed on the anode. In figs. 4 (App. p. 9) and 7–9 (App. p. 10–11), a toroidal magnetic coil (33) is depicted behind the flat anode (29) whereas in fig. 10 (App. p. 11), toroidal magnetic coils are depicted behind both the cathode (28) and the anode (29).

The various embodiments in the Wasa and Hayakawa patent are directed toward preventing the scattering of electrons and plasma out of the sides of the device. In fig. 7 (App. p. 10), a glass guard ring (40) is provided to prevent such scattering. In fig. 8, an auxiliary magnetic coil (41) is provided which prevents scattering.

In each and every figure of the Wasa and Hayakawa patent in which there is a representation of the magnetic field lines generated by a magnetic field producing coil, these magnetic field lines (38) are specifically described and illustrated as being radially directed. Moreover, the Wasa and Hayakawa patent specifically states that the electric lines of force (37) are perpendicular to the target, and that the magnetic lines of force (38) are perpendicular to the electric field lines.

The parties disagree about what is depicted in figure 10. The plaintiffs contend that the embodiment shown in this figure would produce magnetic field lines similar to those in Chapin's patent. Their speculations are based on the disclosure in Wasa and Hayakawa that "a further magnetic field producing coil (43) may be disposed above the cathode as shown in fig. 10 (App. 11) so as to produce a symmetrical magnetic field arrangement," and "the magnetic field producing coil 43 can be used alone without providing the magnetic field producing coil 33." The plaintiff's expert, Dr. Osgood, illustrated his interpretation of this language by adding the blue colored region to figure 10 in Px 25. However, Dr. Osgood admitted that the only depiction of magnetic field lines in fig. 10 are the radial lines of force (38) and no magnetic lines of force are depicted in the patent for the upper coil (43) operating with or without the lower coil (33). (Tr. 419).

What is clear from the Wasa and Hayakawa patent is that the orientation of the magnetic field lines produced by the lower coil 33 emerge in a radial direction perpendicular to the electrostatic potential. This causes the scattering problem which the inventors solved through the use of a guard ring (fig. 7) or an auxiliary magnetic field producing coil (fig. 8).

When the Wasa and Hayakawa patent states that a further magnetic field producing coil (43) may be disposed above the cathode to provide a "symmetrical magnetic field", it follows that the resultant magnetic field produced by the upper coil (43), consists of magnetic field lines extending radially outward and parallel to the lines of force generated by the lower coil (33). Dr. Penfold testified that the field arrangement which results when both sets of coils (33) and (43) are operated simultaneously would be either the quadrupole arrangement developed by Kay (See, e.g., Px 32 fig. 1(c)) or a barrel-shaped field and the arrangement suggested by Dr. Osgood. (Tr. 1843). I accept Dr. Penfold's interpretation of the Wasa and Hayakawa patent.

(4). Mullaly papers

The publication "A Crossed-Field Discharge Device For High Rate Sputtering," RFP–1310, the Dow Chemical Company, November 13, 1969, U.S. Atomic Energy Commission Contract AT (29–1)–1106, and the article with the same title that appeared in the February 1971 edition of Vacuum Technology by James R. Mullaly, are

prior art to the patent in suit. (Pretrial Order Stipulation No. 48).

These papers depict an apparatus with a target configured as a hemispherical cathode, sputtering from its inner surface. The objects to be coated are located below the target on a substrate holder. Magnets are disposed adjacent the target and outside of the vacuum chamber to form an endless tunnel of re-entrant magnetic field lines, and hence a closed loop trap, on the inside of the hemispherical cathode. This combination of cathode geometry and magnetic field shape results in essentially complete confinement of the electrons. The device operates in this way because the hemispherical geometry complements the magnetic field lines.

The Mullaly apparatus also discloses a ring shaped anode adjacent to the cathode, out of the path of the sputtered particles traveling from the cathode to the substrate, and out of the zone of glow discharge confinement. Significantly, Mullaly's papers were cited to the examiner and appear on the front page of the Chapin patent.

### (b). Comparison of the prior art and the Chapin patent

It is clear from the prosecution history and the testimony at trial that sputter-coating is a crowded art. Many inventors before Chapin tried and failed to produce high rate sputter coating systems. Chapin succeeded. In addition to the improvement in coating rates, another major advantage of Chapin's design is apparent. A planar sputtering surface can be easily manufactured in whatever size needed for a given substrate.

While many of the prior art systems contain the basic elements of Chapin's patent, for example, electric and magnetic fields, none functions as well as his. The patented apparatus has a specialized magnetic field which is concentrated over a planar target in such a manner that the lines of magnetic force intersect the target forming a closed loop tunnel. No other prior art device has this feature. No other prior art device works as well.

### (1). Penfold patents

The Penfold II patent and the patent in suit have two general similarities. Referring only to the figure 7 (App. p. 6) embodiments of Penfold II, both patents use planar targets with magnetic means disposed behind the target. Each patent claims to form a completely closed trap which confines electrons near the target surface.

While both patents cover the same general subject matter, their differences are stark. Fundamentally, the Chapin patent claims a single planar cathode while the Penfold patent claims a dual electrode system. The Chapin patent claims a specialized magnetic field using either a permanent magnet or a magnetic coil with pole pieces. This feature is responsible for the concentrated magnetic field that exits from and reenters the cathode surface forming the closed loop tunnel or "racetrack" erosion. The Penfold patent contains no such specialized approach but speaks only of using magnetic fields in a general sense to form electron traps (a technology known since Penning's invention in the 1930s). The trap on Chapin's device is completely closed over a single planar target. The traps over planar targets depicted in Penfold's patent are not.

Dr. Penfold testified as defendant's expert witness. He sharply disagreed with the plaintiff's interpretation of his own patents, the Wasa and Hayakawa patent and the Knauer patent.

Dr. Penfold stated that he considered the Chapin invention a landmark and that to this day he is surprised at how well it works. He maintained under cross-examination that his Penfold II patent would not have taught one of ordinary skill in the art in 1972 how to make Chapin's planar magnetron. Dr. Penfold was instructed by plaintiff's counsel to sketch a modification of his split planar electrode system (Px 171) based on general language in the specifications of the Penfold II patent. Dr. Penfold denied that this sketch represented his thinking in 1972. He stated that he and Dr. Thornton did not consider that particular language in the patent ('353 patent, col.

14, Ins 47–68, and col. 15) applicable to the planar geometries of fig. 7. (App. 6)

In an attempt to discredit Dr. Penfold's testimony interpreting his Penfold II, patent the plaintiffs offered the testimony of Mr. Hans Zaphe. Mr. Zaphe, a German patent attorney, testified that at a meeting with Dr. Penfold in April 1980, Dr. Penfold told him that Chapin's invention had been anticipated by the Penfold and Thornton patents.

### (2). Knauer patent

The ion pump disclosed in Knauer's patent is very similar to the coating apparatus disclosed in Chapin's patent. Knauer's patent was cited to the examiner by Airco during prosecution of the Chapin patent. Airco described the Knauer patent as follows: "The Knauer patent discloses an ionic vacuum pump in which a magnetic field having the shape of an endless arch emerges from and returns to a planar cathode."

Airco narrowed the claims of the Chapin patent to avoid anticipation by the Knauer patent. In particular, the amended claims narrowed the possible location of the anode in Chapin's patent to being "outside the zone of glow discharge confinement and out of the path of travel of sputtered particles moving from the sputtering surface to a substrate."

The parties strenuously disagree over whether the Knauer patent is analogous art to sputter coating devices for making a determination of obviousness under 35 U.S.C. § 103. For reasons set forth below, I find that ion pumps are non-analogous art to sputter coating devices.

Ion pumping and sputter coating apparatus have a common origin in Penning's 1939 patent. (U.S.Pat. No. 2,146,025). Ion pumps employ the physical phenomenon of cathode disintegration by sputtering (as does a sputter coating apparatus), but differ fundamentally in their mode of operation from a coating apparatus. A sputter coating apparatus is designed to apply a coating on a substrate or substrates which are positioned within the device for this purpose and then removed. In contrast, ion pumps are used to evacuate chambers to extremely low pressures. Ion pumps are frequently used in conjunction with other pumps. Once a partial vacuum has been created an ion pump is used for further evacuation.

Sputter coating devices and ion pumps have significantly different operating parameters including pressure, voltage and magnetic field strength.

High-rate sputter coating devices are designed to operate with a high current density in the vicinity of the target. Since ion current causes sputtering to occur, the higher the current for a given voltage, the higher the erosion rate. In practice a sputter coating device like Chapin's has about 10–20 amps of current near the target. In contrast, ionic vacuum pumps operate with $10^{-3}$ to $10^{-6}$ amps of current near the target. This low current minimizes the rate at which the target erodes. Sputter coating targets must be cooled during operation because of the high current density while ion pump targets are not cooled. Finally, target erosion is different. Target erosion produces the thin film in sputter coating and targets are frequently replaced. Ion pump targets are rarely replaced.

Other evidence at trial supports the conclusion that those skilled in the art in 1972 would not look to sputter ion pumps for solutions to sputter coating problems.

For example, plaintiff's expert, Dr. Osgood, was not personally aware of anyone who was designing high rate sputter coating devices who actually studied or looked to ion pumps for guidance. Similarly, the plaintiffs' other expert Dr. Greene, had never even seen the Knauer patent prior to this litigation despite numerous literature searches in the sputtering field. MRC's Chief Engineer, Mr. Hurwitt, testified that he was not familiar with Knauer's work at the time he was designing MRC's Series 900 apparatus despite the fact that he gathered information from the technical literature available at the time. Dr. Penfold testified that when he was attempting to build a high speed sputter coating apparatus at about the same time as Chapin (Dr. Penfold was the only expert witness who

was working in the field at that time), he never considered ionic vacuum pumps to have any relevance at all to problems facing him. He conducted literature searches while attempting to design a high rate sputter coating apparatus but never considered looking at papers on ionic vacuum pumps. He stated he did not know anyone in the field who ever suggested modifying ionic vacuum pumps to operate as sputter coating devices.

### (3). Wasa and Hayakawa patent

The Chapin and Wasa and Hayakawa patents each disclose a sputtering device with planar geometry that is magnetically enhanced. Whereas Chapin sought to increase the rate at which substrates were coated in his sputtering apparatus by concentrating the magnetic field over the cathode, Wasa and Hayakawa used a guard ring or an auxiliary magnetic coil.

Another significant difference between the Chapin patent and the Wasa and Hayakawa patent is the placement of the anode. Chapin's anode is a small rod displaced around the perimeter of the planar cathode. Wasa and Hayakawa's anode is a flat plate opposite the cathode. In the depicted embodiments, the substrates to be coated are shown resting on the anode.

Wasa and Hayakawa, and Chapin differ further in the type of magnetic fields employed. Chapin uses a highly concentrated field, designed to exit and re-enter the same flat surface. Wasa and Hayakawa use a coil that produces radial lines of magnetic force which exit from the flat surface but which remain substantially parallel to it.

### (4). Mullaly

The Mullaly papers and the Chapin patent describe rather different approaches of making high rate sputter coating devices. While it was well known within the art, at least since Penning, that combining magnetic and electric fields enhanced sputtering rates, different inventors have tried different solutions.

Mullaly's solution was to mold his cathode to fit the magnetic field he was using. Mullaly used "quadrupole" magnetic fields as depicted in figure 3 (App. p. 12).

In order to form a closed loop magnetic tunnel adjacent to the cathode surface Mullaly chose a cathode geometry that complemented his magnetic field. As previously discussed, Chapin successfully shaped the magnetic field in his device to intersect a flat cathode twice, forming a closed loop magnetic tunnel.

### iii. Secondary Considerations

Airco has sold in excess of 63 million dollars of glass coating systems incorporating the Chapin invention. These sales were made to approximately 20 different manufacturers of coated architectural, residential, and automotive glass. (Tr. 811-21). In addition, Airco has sold sputter coating devices to those in the semiconductor industry, among others, resulting in gross sales of over 18 million dollars. (Dx 71G). Airco has continued to sell consumable replacement targets to purchasers of its planar magnetrons for an approximate total of 2.5 million dollars and replacement cathode assemblies for glass coating devices for an approximate total of 1.5 million. (Tr. 823-24). Airco has also received income of over 26 million dollars from performing coating services for third parties utilizing the Chapin planar magnetron. Finally, Airco has received royalty income of over 8 million dollars in connection with technology and patent licensing attributable to the Chapin planar magnetron. The Chapin planar magnetron has become the keystone of the defendant's Airco Solar Products Division and is responsible for the division's entire business. (Tr. 827).

Prior to Chapin's planar magnetron patent, the total consumption of coated architectural glass produced using all of the processes known at the time was approximately 23 to 25 million square feet per year. After the introduction of Chapin's invention, Airco Solar Products alone has installed equipment which produces over 300 million square feet per year. (Tr. 848).

The plaintiffs counter that the increase in demand for architectural glass was a result of the energy crisis in the early 1970s and not the invention itself. To support this contention the plaintiffs have cit-

ed zoning ordinances which require more energy-efficient buildings and testimony that buildings with coated glass require less energy to air condition.

At an annual sputtering conference held by the plaintiff MRC in November 1974, MRC's Chief Engineer, Steve Hurwitt, stated the following with regard to certain existing disadvantages of sputter coating as a viable commercial process:

A serious disadvantage in the use of sputtering as a means for the deposition of thin films is the inherently slow deposition rate of the sputtered material on the selected substrate. With a few exceptions, this rate has been limited to less than 1000 angstroms per minute for non-metals. While this slow deposition rate is sometimes undesirable from the consideration of properties of the resultant film, it has far more meaningful impact on capital equipment costs for a given thruput, sometimes excluding sputtering as an economically viable process. The reason for this low rate in conventional sputtering can be traced to inefficient utilization of electrons in the vicinity of the target surface, and the resultant low ion population available for target bombardment.... Clearly, a new configuration of plasma generation and containment is required to affect a meaningful change in achievable deposition rates in a consistent and reliable manner.... Recent publication of the development of a planar magnetron cathode indicates that such a configuration is now available.

(Dx 48 at 3–1).

The recent publication Mr. Hurwitt was referring to was a January 1974 article by Mr. Chapin describing his invention. (Dx 19). The Chief Operating Officer of MRC, Dr. Sheldon Weinig, stated: "The recent development of the planar magnetron sputtering cathode has provided an important tool for the thin film industry and has resulted in the development of a new family of sputtering equipment." (Dx 100). Finally, Chapin's article was the subject of this exchange:

The Court: When you read [Mr. Chapin's article] did you feel [that it] advanced the state of the art?

Mr. Hurwitt: I most definitely felt that way because of the increased deposition rates. (Tr. 1208)

These statements of praise by the plaintiff MRC made prior to the initiation of litigation are a strong indication of the non-obviousness of Chapin's invention.

b. Obviousness: Conclusions of Law

■ In this case, the plaintiffs' contend that various combinations of the prior art references make the Chapin invention obvious to one of ordinary skill in the art. They make the general claim that simple modifications to embodiments in Penfold I produce the embodiments of Penfold II. Extending this argument, the plaintiffs claim that modifications to planar structures in Penfold II would create the Chapin invention. The proposition is clearly true as to the post and hollow cylinder configurations of Penfold I, but it does not apply to the planar configurations of Penfold II. The plaintiffs' contention is directly contradicted by language in Penfold I and II. Read together, Penfold I and II stand for the limited proposition that targets with cylindrical geometries can, with appropriate modifications, operate effectively in either the d.c. or r.f. mode. The planar configurations in figure 7 (App 6) of Penfold II have no analog in Penfold I because the patent states that planar geometries produce unsatisfactory results.

As discussed in the findings of fact, the modifications suggested by the plaintiffs are not suggested in the patent but are by reference to Penfold I discouraged. In addition, Penfold II is directed toward solving a problem in r.f. devices of sputtering from undesired surfaces by splitting the electrodes. Reconnecting the two electrodes together to imitate the Chapin invention would defeat that purpose.

■ As stated previously Dr. Penfold testified he did not believe that the illustration Px. 171 (which he drew at the direction of plaintiff's counsel) was either an accurate or reasonable depiction of an apparatus discussed in the Penfold II patent. I

accept Dr. Penfold's contention that this depiction was neither accurate nor reasonable. Based on my observations at trial, I find that Dr. Penfold was a sincere and knowledgeable witness. I have given his testimony great weight. Notwithstanding Mr. Zaphe's testimony described earlier, I find that Dr. Penfold was a credible expert witness and accept his interpretation of the Penfold II patent.

█ The Knauer patent is a different matter. For the purposes of determining obviousness I have not considered the Knauer patent. The ion-pump described and claimed in Knauer operates in the same way as Chapin's sputter-coating device. Both Chapin's planar-magnetron and Knauer's ion-pump utilize sputtering produced by a Penning discharge. Regardless of this similarity, the two inventions have radically different purposes. While ion-pumps are within the field of endeavor in which Mr. Chapin labored, there was no credible evidence at trial that any of the workers involved in making high rate sputter coating apparatus ever considered or suggested modifying sputter ion-pumps for coating substrates. The person of ordinary skill in the art in 1974 who wished to design a sputter-coating device would not have considered ion-pump art pertinent to problem facing him. The defendant has clearly stated at trial that the restriction on anode location in the patent claims was necessary to avoid anticipation. However, the obviousness inquiry attempts to determine not whether two inventions are identical but whether at the time of invention it would be obvious to make the invention. After-the-fact comparisons with inventions that are similar will not demonstrate obviousness without proof that at the time of the invention, a person of ordinary skill in the art would have looked to inventions of that type for a solution to his problem.

Turning to the Wasa and Hayakawa patent, I did not find Dr. Osgood's testimony interpreting this patent to be sufficiently convincing. What is clear from the Wasa and Hayakawa patent is that the orientation of the magnetic field lines produced by the lower coil 33 (figs. 4–10, App. 9–11)

emerge in a radial direction perpendicular to the electrostatic potential. This causes the scattering problem which the inventors solved through the use of a guard ring (fig. 7) (App. 10) or an auxiliary magnetic field producing coil (fig. 8).

When Wasa and Hayakawa states that a further magnetic field producing coil (43) may be disposed above the cathode to provide a "symmetrical magnetic field", it follows that the resultant magnetic field produced by the upper coil (43), consists of magnetic field lines extending radially outward and parallel to the lines of force generated by the lower coil (33). Dr. Penfold testified that the field arrangement which results when both sets of coils (33) and (43) are operated simultaneously would be either the quadrupole arrangement developed by Kay (See, e.g., Px 32 fig. 1(c)) or a barrel-shaped field and the arrangement suggested by Dr. Osgood. (Tr. 1843). I accept Dr. Penfold's interpretation of the Wasa and Hayakawa patent.

The Wasa and Hayakawa patent states that the embodiment shown in fig. 10 (App. 11) can be operated with only the upper coil (43). The plaintiffs assert that this is the Chapin invention. In contrast, I find that if Messrs. Wasa and Hayakawa had appreciated that plasma containment could be achieved and their scattering problem solved by a magnetic field arrangement forming a closed loop magnetic tunnel on the surface of the cathode as in the Chapin patent, they would have stated as much.

The Mullaly references are the closest pertinent or analogous prior art for obviousness purposes. Indeed, Mr. Chapin began the project for Airco with a rain-gutter shaped cathode modelled after Mullaly's hemispherical cathode. Where Mullaly had used the cathode shape to form a closed loop track, it was Chapin who modified the magnetic field and produced a working device.

Strong secondary considerations also support the conclusion that the Chapin patent was non-obvious. The Chief Engineer of MRC at a conference on sputtering strongly praised the Chapin invention as described in the technical literature. Airco

has enjoyed tremendous commercial success with coating architectural glass, generating twelve times the total industry's prior output after developing the Chapin invention.

### 2. Anticipation

■ An invention must be 'novel' to qualify for a patent. A patent claim is "anticipated" or invalid under 35 U.S.C. §§ 101–2 for lack of novelty, if all elements or features of the claim are found in a single prior art reference.

> It is settled that "a party asserting that a patent claim is anticipate must demonstrate, among other things, identity of invention" *Kalman v. Kimberly-Clark Corp.*, 713 F.2d 760, 771 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1026 [104 S.Ct. 1284, 79 L.Ed.2d 687] (1984). Further, identity of invention is a question of fact and the challenger must ordinarily show that each element of the claim in issue is found in a prior patent or publication, either expressly or under principles of inherency.

*Tyler Refrigeration v. Kysor Industrial*, 777 F.2d 687, 689 (Fed.Cir.1985).

■ The plaintiffs claim that the Chapin patent is anticipated by both the Wasa and Hayakawa patent and by Penfold II. As previously mentioned in the factual findings, I do not accept the plaintiffs' interpretations of either the Wasa and Hayakawa patent or Penfold II. Neither reference contains all of the elements or features of any of the individual claims of the Chapin patent.

### B. Inequitable Conduct

■ Inequitable conduct before the PTO in obtaining a patent renders all of the claims of that patent unenforceable. *J.P. Stevens & Co. v. Lex Tex Ltd.*, 747 F.2d 1553, 1561 (Fed.Cir.1984), *cert. denied*, — U.S. ——, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985). " 'Inequitable conduct' requires proof by clear and convincing evidence of a threshold degree of materiality of the non-disclosed or false information." *Id.* at 1559. The test to establish whether this threshold has been met is if "there is a substantial likelihood that a reasonable ex-

aminer would have considered the omitted reference or false information important in deciding whether to allow the application to issue as a patent." *Id.*

■ In addition to showing threshold materiality there must be a showing of intent. *Id.* at 1560. Intent may be inferred from acts "the natural consequences of which are presumed intended by the actor" or by gross negligence. *Kansas Jack, Inc. v. Kuhn*, 719 F.2d 1144, 1151 (Fed.Cir.1983). Intent and materiality are often interrelated and intertwined. When a prior art reference is highly material to the pending application a less stringent standard, gross negligence, will establish intent. Similarly, wrongful intent will lower the materiality requirement. *Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1455 (Fed.Cir.1984).

The plaintiffs argue that Airco violated this duty of candor before the PTO by withholding prior art and by filing misleading statements. They claim that the following acts or omissions of Airco constituted inequitable conduct: (1) Airco's failure to cite either of the Penfold patents to the examiner; (2) Airco's failure to submit the Wasa and Hayakawa patent while citing a technical paper by the same inventors; and (3) Airco's December 1978 submissions of the Knauer patent and the amendment to the pending claims. In regard to the third allegation above, plaintiffs allege that Airco executed an elaborate scheme to mislead the patent examiner about the importance of the Knauer patent in its two December 1978 submissions.

■ There is no question that the defendant knew about the Penfold patents. Mr. Bopp, Airco's in-house patent counsel, admitted being aware of the Penfold patents during the prosecution of the Chapin patent. He did not submit either patent to the examiner believing neither was as pertinent as art previously cited. Based on my own evaluation of the Penfold patents as prior art, I find that Mr. Bopp could have in good faith believed that the Penfold patents were not sufficiently material to the Chapin claims to cite them to the exam-

iner. Further, I conclude that the Penfold I and II patents would not have been considered important by the examiner in deciding to issue the patent. The omission of the Penfold patents from Airco's prior art submissions to the PTO is not 'clear and convincing' evidence of inequitable conduct.

The plaintiff's allegation is also diminished by the fact that the same individual, Mr. Langel, was the examiner of both Penfold I and the Chapin patent. He was also the examiner of the Corbani patent, which lost an interference to the Chapin patent. It is clear he has at least some familiarity with the sputter-coating art and related patents.

The failure to cite the Wasa and Hayakawa patent, while not as straightforward, was as innocuous as the failure to cite the Penfold I and II patents. Dr. Draegert of the Airco patent department received a copy of an English-language technical publication by Wasa and Hayakawa which in a footnote cited the Wasa and Hayakawa patent. He ordered a copy of the Japanese patent. After receiving the patent he compared its figures to those in the article and ordered only a partial translation of the patent. Dr. Draegert does not understand Japanese. He submitted the publication alone since he believed based on limited information that the patent would have been redundant. While Airco could have been more diligent in obtaining a full translation of the Wasa and Hayakawa patent, its actions demonstrate neither gross negligence nor intentional fraud. In addition, since I believe that the Wasa and Hayakawa patent is less pertinent art than the Penfold I and II patents, failure to cite it will not support a finding of inequitable conduct. The plaintiffs have not shown by clear and convincing evidence that the failure to cite the Wasa and Hayakawa patent constituted inequitable conduct.

The final charge of inequitable conduct is somewhat bizarre. In December 1978 Airco filed a supplemental prior-art statement identifying seven prior art documents, including the Knauer patent. Airco described the Knauer patent as follows: "The Knauer patent discloses an ionic vacuum pump in which a magnetic field having the shape of an endless arch emerges from and returns to a planar cathode." (Px 17 pp. 1–2).

In an amendment filed contemporaneously with the supplemental prior art statement, Airco stated that its purpose in amending the pending claims was to make them more definite. However, Mr. Bopp had told Mr. Chapin that the claims were amended so that they would not be anticipated by Knauer's patent under 35 U.S.C. § 102.

The plaintiffs attempt to connect each of these actions to a plan intended, in their words, to 'slip in a reference at the last minute' when the examiner would not be as diligent in inspecting submissions. (Tr. 582). Similarly, the plaintiffs argue that these submissions just prior to the grant of the patent came at a time when the examiner had the 'mind-set' to issue the patent. (Tr. 577).

In order to accept the plaintiffs' theories, I would need to believe that the examiner did not properly discharge his duties. To the contrary, I find that Airco clearly stated the relevance of the Knauer patent to the examiner. The Knauer patent is material in so far as the Chapin claims were amended to avoid anticipation by it. It would be extremely difficult, however, to infer intent to defraud from the sequence of events here. While the statements made to the PTO and to Mr. Chapin were not identical, Airco did not lie to the PTO about its purpose for amending the claims. It is clear to the Court that the examiner had sufficient information before him to understand the importance of the Knauer patent and the effect of the applicant's amendment.

I firmly believe that the conduct of the Airco patent attorneys, Bopp and Draegert, displayed good faith efforts to supply the patent office with all pertinent and material prior art. The citation of the Knauer article and the prompt submission of the Knauer patent after its discovery are examples of such an effort.

C. Inventorship

 The plaintiffs also challenge the validity of the Chapin patent on the

grounds that it incorrectly claims Mr. Chapin as the sole inventor. A patent which does not name all inventors is invalid. 35 U.S.C. § 102(f). The granting of a patent is prima facie evidence of correct inventorship. That presumption can be overcome only by strong, clear and convincing evidence. *Congoleum Industries v. Armstrong Cork Co.*, 339 F.Supp. 1036, 1055 (E.D.Pa.1972), *aff'd*, 510 F.2d 334 (3d Cir.), *cert. denied*, 421 U.S. 988, 95 S.Ct. 1991, 44 L.Ed.2d 478 (1975).

This case is not an attempt by an omitted inventor to seek recognition or compensation. Rather the party seeking to invalidate the patent has raised a question whether an employee of the assignee of a patent has made a contribution to the invention purchased such that he should have been included as a co-inventor.

The record does not clearly show whose idea it was to place the anode on the outer perimeter of the cathode. In Mr. Chapin's Original Record of Invention (Px 84), the anode is shown as a small rod set above and in the middle of the cathode. It appears that this configuration does not support the limitation in the claims that the anode be "outside the zone of glow discharge confinement and out of the path of travel of sputtered particles moving from the sputtering surface to a substrate." However, as described by Chapin in his deposition, his 1974 article had an anode displaced around the perimeter of the cathode. (Chapin dep. at 86–87). This configuration supports the limitation in the patent claims. Mr. Cormia suggested that the anode be positioned below the sides of the cathode and out of sight of the sputtered surface. *Id.*

█ This is not convincing evidence that Cormia did anything more than suggest lowering the anode to a position depicted in the patent. It most certainly is not proof that Cormia was a co-inventor. The plaintiffs have failed to show by strong, clear, and convincing evidence that Chapin was not the sole inventor of the patent in suit.

IV. Conclusion

I conclude that the plaintiffs have failed to carry their burden of proving by clear and convincing evidence that the Chapin patent is invalid for obviousness, anticipation or incorrect inventorship. I also conclude that the plaintiffs have failed to carry their burden of proving by clear and convincing evidence that the Chapin patent was obtained through inequitable conduct before the PTO. Although this decision ends the parties' dispute over the validity of the Chapin patent, the defendant's counterclaim of infringement that was bifurcated before trial remains to be adjudicated.

FIG. 3.

FIG. 1.

FIG. 2.

INVENTORS.
ALAN S. PENFOLD
JOHN A. THORNTON
BY
Lyon & Lyon
ATTORNEYS

920

FIG. 4A.

FIG. 4B.  FIG. 5B.

FIG. 5A.

INVENTORS.
ALAN S. PENFOLD
JOHN A. THORNTON
BY
Lyon & Lyon
ATTORNEYS

FIG. 4C.

FIG. 4D.

FIG. 5C.

INVENTORS.
ALAN S. PENFOLD
JOHN A. THORNTON

BY

ATTORNEYS

Foster II

Fig.1

Fig.4

Fig.2a

Fig.2b

Fig.2c

Fig.2d

Fig.3a

Fig.3b

Fig.3c

Fig.3d

Fig.3e

Fig.5a

Fig.5b

Fig.5c

Fig.6a

Fig.6b

Fig.6c

Fig.6d

Fig.6e

*Fig.7a*

*Fig.7b*

*Fig.7c*

*Fig.7d*

**926**

■■■■■■■■■■■

Nov. 9, 1 5          W   ER          ...  2

Filed Sept. 10, 1952                    3 Sheets    1

K.Sauer

FIG.1.

FIG.2.

FIG.3

FIG.4

Exhibit
No. ___ Bopp 135  1
1/15/65

Filed Sept. 15, 1932

Fig. 12.

Fig. 10.

Fig. 11.

Inventor
William Allison

第1図

7 11 2'

2
3
10
9
1
5
6
8
4

第2図

12 20 18
16 14 19 13
15 17 4

19
14
15
17 8

第3図

24
21
23
22
25

第4図

37
26
28
38
31
30
29
32
33
34
27
36 35

第9図

第10図

第11図

第5図

第6図

第7図

第8図

Chapin

FIG. 1.

FIG. 2.

FIGURE 3. Discharge Fields and Geometry.